# Commonwealth *v.* Huston, Appellant.

*Criminal law—Conspiracy—State contract—State officers—Architect—Certification by architect.*

1. Where an architect whose plans for the fitting and furniture for the state capitol are accepted by the state agrees personally to supervise the work, and to certify that the furniture delivered had been made according to his designs and specifications, such architect may be convicted of a conspiracy with the contractor to defraud the state by proof that in collusion with the contractors he falsely and fraudulently certified that the contractor was entitled to receive a certain amount of

money upon an invoice which he knew to be false and fraudulent, and by proof that according to the custom of architects, an architect who certified that there was an amount of money due, was obliged to make the investigation necessary to ascertain the truth of his statement.

2. In such a case the trial judge cannot declare as matter of law that the defendant only meant to certify that the furniture in question had been made in conformity with his designs and specifications, and that he had not meant to certify that the contractor was entitled to a specific sum of money.

*Practice, C. P.—Trial—Charge of the court.*

3. Where an assignment of error complains that the charge was inadequate and no particular error of law or material misstatement of the evidence is pointed out, the court will be reviewed on the general effect of the charge, and not upon isolated sentences nor paragraphs disconnected from the context which qualifies and explains them; if, as a whole, the charge is calculated to mislead, there is error; if not, there is no ground for reversal.

4. If counsel at the trial deems that the court omitted to say something which it ought to have said, relating solely to the review of the evidence, it is his duty to ask that the omission be corrected. If he fails to do so the fair inference is that he does not consider the charge inadequate.

*Criminal law—Conspiracy—State contract—Architect—Evidence.*

5. Where an architect has certified as to the correctness of an invoice of a state contractor for furniture for the state capitol, and it is admitted that the invoice in itself was false and fraudulent, the commonwealth may in a criminal suit against the architect show the construction which the architect himself and all the parties to the contract with the state had put upon the contract in connection with the duties of the architect in certifying the invoices.

6. In such a case any evidence directly bearing upon the good faith of the architect's contention that he acted in good faith is admissible. Thus the commonwealth may show that the furniture in question was not specially designed, and had not been made in accordance with designs and specifications prepared by the architect.

7. The commonwealth may also show that the invoice of the furniture in question was not only false as to measurements, but that it was so flagrantly false that its fraudulent character must have been known to anyone who made the slightest attempt to ascertain its accuracy.

8. Proof is also admissible to show that the architect and contractor combined to bring about a condition of things in reference to a certain article that would prevent competitive bidding as to this article and secure the supply of it to the contractor.

9. The commonwealth may also show that the defendant issued two

certificates to the effect that the contractor was entitled on account of his contract to certain large sums of money named, without specifying in the certificates that any furniture had been delivered to the state, or was ready for delivery to the state which complied with the plans and specifications of the architect. These certificates are properly admissible as tending to show the construction which the defendant put upon the contract, the duties and powers which he assumed, the meaning which he intended his certificates generally to produce in assisting the contractor to obtain money from the state treasury, and as parts of a connecting series of frauds, intentionally committed and not attributable to mere negligence or mistake.

10. Such a case is properly referred to the jury where the evidence disclosed that no consistent system of measurement had been adhered to in determining the price to be paid by the state for certain desks, and that the defendant took an active part in having the contract so framed that the contractor would be paid for desks and other furniture at so much per foot, without specifying whether it was by the lineal foot, square foot of surface, or cubic foot, thus leaving the contractor, the architect and the state officers free to interpret the contract in such a way as to permit them to pay to the contractor almost any price for the furniture that his cupidity might dictate.

*Practice, C. P.—Verdict—Jury.*

11. Where on the trial of an indictment for conspiracy the jury returns a verdict of having found "the defendant guilty of defrauding the commonwealth," and upon being questioned by the court the foreman states that the jury had "agreed that there was no conspiracy," the court may send the jury back with instructions that they must either find the defendant guilty of conspiracy, or find him not guilty; and if the jury returns a verdict of "guilty as indicted," such verdict may be received and recorded as the verdict of the jury.

12. When a jury tenders a verdict which is defective in substance, uncertain, repugnant, or not responsive to the issue, it is proper for the court to reject it, as not warranted by law, call the attention of the jury to the defect, instruct them as to the form of verdict in case they mean to acquit or convict the defendant, and send them back to their room where they can, untrammeled by the presence and influence of others, find such a verdict as they think proper.

13. Where the jury returns a written finding which is clearly insufficient, and not responsive to the issue, and the trial judge questions the foreman of the jury as to the meaning of the verdict, to which questions the foreman gives conflicting answers, such answers cannot be considered as constituting an oral verdict.

Argued Dec. 12, 1910.   Appeal, No. 16, March T., 1911,

by defendant, from judgment of Q. S. Dauphin Co., Sept.
Sessions, 1907, No. 240, on verdict of guilty in case of Commonwealth v. Joseph M. Huston et al. Before RICE, P. J.,
HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and
PORTER, JJ. Affirmed.

Indictment for conspiracy.

The facts are stated in the opinion of the Superior Court.
See also Com. v. Sanderson, 40 Pa. Superior Ct. 416, and
Com. v. Snyder, 40 Pa. Superior Ct. 485.

At the trial the commonwealth made the following offer:

The commonwealth offers to identify and put in evidence as exhibits in this case four desks furnished to the
commonwealth under the bill set forth in the indictment
and now in evidence as commonwealth's exhibit "H–16,"
charged in said bill as follows:

"1, Page 60, room 169, 1 desk 20 feet, at $18.40 per
foot, $368.00; 2, Page 13, room 116, 1 desk 15 feet, at
$18.40 per foot, $276.00; 3, Page 219, room 310, 1 desk
16½ feet, at $18.40 per foot, $303.60; 4, Page 91, room
511, 1 desk 7½ feet, at $18.40 per foot, $138.00; and to
prove by G. L. Holton, Superintendent of the factory of
the Derby Desk Company, by which company said desks
were made, that Desk No. 4, above mentioned is three
inches longer than Desk No. 3, and that Desks Nos. 1
and 2, above mentioned, are each 5½ feet long—it appearing from the bill in evidence that Desk No. 4, is charged
as containing 7½ feet, whereas Desk No. 3, is charged as
containing 16½ feet; and that Desks Nos. 1 and 2 are
charged as containing 20 feet and 15 feet respectively."

This offer is made for the purpose of illustrating the
testimony of the commonwealth and demonstrating that
said bill is false as to measurements. In connection with
this offer the commonwealth purposes to prove by the said
G. L. Holton that Desk No. 2, above mentioned, and
thirty-three other desks in said bill, are not specially designed desks made in accordance with designs and specifications prepared by the defendant, Huston, and ap-

proved by the superintendent of the public grounds and buildings, and the board of public grounds and buildings, but are stock articles supplied from the catalogue of the said Derby Desk Company, without any reference to Huston's designs or specifications. For the purpose of showing that said bill and Huston's approval thereof are false and fraudulent, and for the purpose of showing Huston's intent to defraud.

Mr. Graham: The defendant objects to the offer of the commonwealth just made.

The Court: The objection is overruled, the offer is received. Exception for defendant. [5]

Mr. Cunningham: If the court please, we offer in evidence that portion of the page of the catalogue identified by the witness showing the design of the class B. roll-top desk in question under this bill.

Mr. Graham: That is admitted subject to our objection and exception of course.

The Court: Received subject to the former objection.

Mr. Cunningham: The commonwealth now proposes to prove by the witness on the stand, G. L. Holton, that with reference to the class A. and class C desks covered by the bill in question, none of them were manufactured from designs or specifications prepared by the defendant Huston, the class A desks having been manufactured from a design prepared jointly by the witness Holton and John H. Sanderson by taking catalogue desks and making certain combinations and changes on the same; the class C desks having also been manufactured from designs prepared jointly by the witness Holton and Sanderson; and that with reference to the manufacture of class A and class C desks, the witness had no knowledge of any plans or specifications prepared by the defendant Huston, and none of said desks were in fact manufactured in accordance with or from any plans or specifications prepared by the defendant Huston.

Mr. Graham: I object to it first, because it does not say when they made this design.

Second, it says that it was made from a design prepared by the witness and John H. Sanderson.

Third, it does not state that Sanderson had not access to the Huston designs.

Generally, it is irrelevant and immaterial.

Mr. Cunningham: I amend the offer, if the court please, by saying that the offer is to prove that these designs were prepared by Sanderson and Holton when the order was given by Sanderson to Holton in 1905.

Mr. Graham: You see that is after the specifications and designs of Huston were made and in existence and had been approved by the board.

The Court: The objection is overruled, the offer is received and exception noted for the defendant. [6]

Henry C. Mercer, recalled, testified as follows:

Mr. Cunningham: The commonwealth proposes to prove by Henry C. Mercer, the witness on the stand, that he, Mercer, being the only manufacturer of Moravian tiling in America, entered into an arrangement with the defendant, Joseph M. Huston, to supply the Moravian tiling for the main floor of the capitol building at $1.03 per square foot. That while said arrangement was in force and after the schedule of 1904–1905 had been approved, but before the last day for bidding thereon had arrived, Huston sent a copy of said schedule to the witness, accompanied by the following letter:

"My dear Mr. Mercer:

"I sent to you under separate cover a schedule for the next year's supplies for the State, and on page turned down and marked you will see the reason for my note of the other day. As something must be bid off the maximum I do not want you to quote any lower. This is intended to pay for the extra floor I want, i. e., the Governor's Executive Reception Room where Miss Oakley paints and other hearths, etc. I am glad to hear that you are getting on so well and when the time arrives will be delighted to go up to see you. The Governor was much pleased when

I told him of the tile work and the subjects incorporated.

> "With kindest regards, I am,
> "Yours truly,
> "J. M. HUSTON."

That Mr. Mercer never knew John H. Sanderson in the transaction and never gave him any quotation on Moravian tiles, and never communicated with Sanderson or received any communication from him.

The offer of this testimony is made in connection with the testimony already in, showing that Sanderson bid twenty-five per cent off the maximum price of $3.00 per foot on Item No. 41 in the schedule, being the item for Moravian tiles; for the purpose of showing collusion between Huston and Sanderson, and that Huston attempted to make an arrangement with Mercer that would prevent bona fide competitive bidding on this item of the schedule, and for the purpose of showing that Huston was a party to the attempted conspiracy between Sanderson and others to defraud the commonwealth.

Mr. Graham: This offer is objected to as irrelevant, immaterial and not pertinent to the issue. It is also objected to because the letter quotes "a note or letter of the other day," and we object to this letter being put in evidence without the production of the letter that is quoted, which is said to be explanatory.

Mr. Cunningham: To which objection counsel for the commonwealth makes the further offer to prove that diligent search has been made for the note referred to in the letter now offered in evidence, after which search the same has not been found; and that the witness, Mr. Mercer, now has no recollection of the note referred to or of its contents.

Mr. Graham: Counsel for defendant reply that the added statement does not overcome the force of the objection that has been made, but on the contrary shows how a fragment of the correspondence on the subject is offered.

The fragment ought not to be admitted unless the entire paper is produced.

The Court: When we adjourned this morning there was an offer pending with objections to it. I think we will have to overrule the objections to the offer and admit it, giving an exception to the defendant. [7]

The court charged in part as follows:

[You will take the certificate and read it. Does it mean that he was certifying that the amount of this particular bill and the amounts in the other bills to which the certificates are attached—does he mean that John H. Sanderson, the contractor, was entitled to those amounts? You will read the certificates and determine. Are they open to interpretation? Is there any ambiguity about them? Can they be misunderstood? That is for you to determine.] [1]

[The Court: Gentlemen of the jury:.We understand you desire further instructions in the case. Is that true? Upon what question?

(Note handed to Court by foreman.)

The Court: The first question you ask, gentlemen of the jury, is: Has this contract signed by Huston placed him, said Huston, under all the responsibility for whatever was furnished in the capitol?

If you mean by that, was he responsible for what he certified in his certificate, we say that he was responsible for what he meant by that certificate. In the general charge we undertook to say to you it was for you to determine from all the evidence in the case what he honestly meant by that certificate; whether he meant to certify that John H. Sanderson was entitled to the particular amount of the bill inserted in the certificate which would include the measurement and the price, because the amount is made up of measurements and prices, whether he intended to certify that, or whether he merely intended to certify that the articles furnished were in accordance with his plans and specifications; and we said you were to de-

termine that from all the evidence in the case. We called your attention to the certificate, which, as you will recall, reads: "I certify that John H. Sanderson is entitled" in that particular certificate attached to the bill set forth in this indictment, "certify that John H. Sanderson is entitled to sixty-one thousand and some hundred dollars." Did he mean what that says, or, as suggested by the defense, did he mean and intend that that certificate should signify merely that the articles in the bill, that bill and the other bills offered in evidence, were in accordance with his plans and specifications? If he meant to certify that the amount was due, if he meant to certify that John H. Sanderson was entitled to the amount set forth in the certificate, and he knew that amount was false, and he certified it pursuant to an understanding he had with the other parties named in the indictment, it would amount to a conspiracy. If, on the other hand, he merely meant to certify, as suggested by the defense, that the articles in that bill and in the others conformed to his plans and specifications, and intended nothing more, then we say to you he would not be guilty of fraud; and that is the question you are to determine. Read the certificate, see the language used there, and determine what he meant by that, together with all the other evidence in the case. What a person means is generally determined by what he says or frequently by his conduct, and you are to determine from the certificate itself, from the language used, and from all the circumstances in the case, and from all the evidence relating thereto, whether he meant that Sanderson was entitled to that particular amount mentioned in the bill set forth in this indictment and in the other bills—the amounts in the other bills—whether he meant that, or whether he meant to certify merely that the articles in the bills conformed to his plans and specifications. If he meant the former, and knew the bill was false and certified it pursuant to an understanding or an agreement with the other parties named in this bill, the offense set forth in this indictment would be made out. If he merely

meant to certify, although his language was general, and honestly intended to certify that the articles conformed to his plans and specifications, then we say he could not be convicted of fraud.  So you will determine what he meant, from what he said and the other circumstances in the case.  What does the certificate mean?  Does it mean what it seems to declare, or does it mean, as contended by the defense, only that he certified to the articles being in conformity with the plans and specifications?  I think that answers your question; doesn't it, gentlemen; that is what you mean?

You ask further: Explain more fully with regard to the testimony of all the architects.

You will recall the architects were called to testify on behalf of the defense—those in behalf of the defense— that the certificate used was the one in the usual form issued, and that it was in accordance with the usages and practices of the profession of architects, and they also testified when the resolution of the board of commissioners of public grounds and buildings employing or appointing the defendant as architect and the correspondence notifying him of his appointment, and his letter accepting it—when those documents were read to them, they said that in their judgment they would say he had nothing more to do than to certify that the articles were in accordance with his plans and specifications.  But we said in the general charge, gentlemen, that the question is not what interpretation is now to be put upon these documents with respect to what the scope of his employment was, but you are to determine what he understood it to be, what the parties to that contract with the board of commissioners of public grounds and buildings understood it to be, what he understood it to be, and that you are to determine from what he did under it.  And in that connection you are to consider the evidence relating to what he actually did.  What he actually did would show what he understood was his employment; and if he understood that he was to measure and be responsible for the amount paid on account of this

contract with the contractor, if he understood that and certified the amounts, intending to certify the amounts as being due and payable on the contract and knew them to be false, and did so pursuant to an understanding with the other parties in the indictment, then the crime of conspiracy would be made out. On the other hand the architects for the commonwealth testified practically the same thing. One of them at least said that under the contract of employment, as shown by the resolution of the board and the correspondence between the board and the defendant, that his employment was only to prepare plans and specifications and detail drawings, but they testified also without regard to what the defendant himself did as showing what he understood the contract and his duties to be under it. So you see, so far as the testimony of the architects is concerned, you are to determine how much weight is to be given to it, having in mind that they were testifying to the contract as it appeared from the resolution and from the correspondence between the board of public grounds and buildings and the defendant, not what it was, taking into consideration the conduct and the acts of the defendant himself under it.

What I have said answers your inquiries and you may retire and consider the case further. Are there any further matters that you desire instruction upon?

We are asked by the defendant's counsel in this connection to say to you that under the contract, as appears by the resolution of the board and by the correspondence between the board and the defendant, he was not bound to do anything more than prepare the plans and specifications and detail drawings. That is true, but we again say to you, gentlemen of the jury, the question for you is not what the construction of that contract is now, as we read it aside and apart from what the defendant understood it to be, but the question for you to determine is what he understood it to be, what he understood his duties to be, from what he did and from how he acted respecting it.

You may retire, gentlemen, and consider of your verdict.] Exception [3].

The court also charged as follows:

[Then there is another circumstance you will have to consider in that connection as to what the defendant considered to be his duty, and what he meant by his certificate, and that is the testimony of the witness, Holton. He testified, you remember, that no designs or plans and specifications were furnished to him by Huston. You will determine what light that sheds upon the suggestion of the defense that the defendant believed he was certifying and intended only to certify by these certificates, that the articles conformed to his plans and specifications. Could he honestly believe he was certifying that the articles conformed to his plans and specifications when he did not furnish any plans and specifications? You will consider that in connection with the question whether or not that is what he intended his certificate to mean, whether he meant to certify that the defendant, Sanderson, was entitled to the particular amount of the bill to which the certificate is attached, or whether he merely intended to certify that the articles contained in the bill conformed to his plans and specifications.] [4]

When the jury returned the proceedings were as follows:

The Clerk: Gentlemen, have you agreed upon a verdict?

The Foreman: We have.

The Court: Gentlemen, do you mean by this that you find the defendant guilty of the conspiracy charged in the indictment?

The Foreman: No, sir.

The Court: You must determine—the question for you to determine is whether he is guilty of the conspiracy charged in the indictment. You mean by this, you find him guilty of the charge contained in this indictment?

The Foreman: It is changed, don't you see?

The Court: You say the defendant is guilty of defrauding the commonwealth. We ask you whether you mean by that, whether you find him guilty of the charge contained in this indictment. Is that what you mean?

The Foreman: We let the conspiracy off, we agreed to let the conspiracy off.

The Court: The question to determine is, whether he was guilty of the conspiracy.

The Foreman: That is what we would not agree.

The Court: Have you considered that?

The Foreman: Yes, sir; and we agreed that there was no conspiracy; we have agréed on that.

The Court: The question for you to determine is, whether the defendant is guilty of the conspiracy charged in the indictment, being party to the conspiracy charged in the indictment to defraud the commonwealth. That is what you mean?

The Foreman: They all agreed; that is the only way they would agree.

The Court: We will have to send you back, and you will have to determine the question before you. This indictment charges the defendant with having conspired with the other persons named in the indictment with the conspiracy to cheat and defraud the state by means of the false bill set forth therein. That is the question you are called upon and you are sworn to determine. If you have not considered that or reached a determination upon that, you may retire and consider that question. The charge is that of conspiracy, with having acted in concert with the other persons named in the indictment to cheat and defraud the commonwealth in the manner set forth pursuant to an understanding between him and the others.

Mr. Graham: If they are not guilty of the conspiracy they are not guilty of anything.

The Court: If he is not guilty of the conspiracy, if he is not guilty of the charge in the indictment, then you say so by your verdict. If he is guilty, if you are satisfied beyond a reasonable doubt that he is guilty of conspiring

with the others to cheat and defraud the commonwealth by means of the false bill set forth therein, you say so by your verdict. Suppose you retire and consider that. You understand the charge is that the defendant passed this bill, that he passed this bill set forth in the indictment, knowing that it was false, with intent to cheat and defraud the commonwealth, and did so pursuant to an existing understanding between him and the other persons named in the indictment, who also approved and certified and caused the bill to be paid. [11]

Mr. Graham: Whereas the foreman in behalf of the jury announced that they had agreed that the defendant was not guilty of conspiracy, I ask that that be recorded as the verdict of the jury, and the jury be dismissed from further consideration of the case. *Answer:* Refused. [12, 13.]

Verdict of guilty upon which the prisoner was sentenced to pay a fine of $500 and undergo an imprisonment of not less than six calendar months nor more than two years.

*Errors assigned* were (1, 3, 4) above instructions; (2) that the charge was inadequate; (5–7) rulings on evidence quoting the bill of exceptions; (8) in admitting the quantities plans; (9) in admitting the certificates for $50,000 and $75,000 quoted in the opinion of the Superior Court; (10) in refusing binding instructions for defendant; (11–13) rulings as to the verdict.

*George S. Graham* with him *Charles H. Bergner, Lyman D. Gilbert, Samuel M. Clement, Jr.,* and *A. S. L. Shields,* for appellant.—There are numerous authorities supporting the views urged by the defendant, in respect to the power and duty of the court, in the matter of receiving or refusing, moulding and recording the verdict of the jury: State v. Clifton, 30 La. Ann. 951; State v. Arrington, N. C. 571; State v. Godwin, 138 N. C. 582 (50 S. E. Repr. 277); Duncan v. State, 49 Miss. 331; State v. Shule, 32 N. C. 153; Grant v. State, 33 Fla. 291 (14 So. Repr. 757);

Champ Spring Co., v. Roth Tool Co., 103 Mo. App. 103 (77 S. W. Repr. 344); Williams v. The People, 44 Ill. 478.

The cases in Pennsylvania on this subject show that the courts in this state recognize the distinction between amendments in form and amendments of substance, by the jury, and hold that the latter are not proper: McConnell v. Linton, 4 Watts, 357; Wolfran v. Eyster, 7 Watts, 38; Kramer v. Kister, 187 Pa. 227; Mix v. North American Co., 209 Pa. 636.

*J. E. B. Cunningham*, deputy attorney general, and *James Scarlet*, with them *John Fox Weiss*, district attorney, *John E. Fox* and *M. Hampton Todd*, attorney general, for appellee.—The court committed no error in its rulings on the verdict: State v. Bishop, 73 N. C. 44; State v. Davis, 31 W. Va. 390 (7 S. E. Repr. 24); Com. v. Nicely, 130 Pa. 261; Grant v. State, 23 L. R. A. 723.

OPINION BY PORTER, J., March 3, 1911:

This appellant was in a number of indictments charged jointly with John H. Sanderson, James M. Shumaker, William P. Snyder and William L. Mathues with conspiracy to defraud the commonwealth of Pennsylvania. One of said indictments was No. 239, September Sessions, 1907, of the court below, and Joseph M. Huston having been granted a severance in that case, the other defendants were upon that indictment jointly tried and convicted. The indictment involved in the present proceeding is No. 240, September Sessions, 1907, of the court below, and a severance having been granted the other defendants in this case, the appellant, Joseph M. Huston, was tried in the court below and convicted, and from that judgment we have this appeal. The board of commissioners of public grounds and buildings had employed Joseph M. Huston as architect to prepare plans and specifications and all detailed drawings for all interior fittings, furniture, electric and gas fixtures for the new capitol building at Harrisburg, and he had accepted that appointment. The board

of commissioners of public grounds and buildings had, in May, 1904, in the schedule for the years 1904–1905 included a special schedule embracing forty-one items, numbered consecutively from No. 1 to No. 41 inclusive, covering the fittings, furniture, decorations, electric light fixtures and carpets to be supplied for the new capitol building at Harrisburg, and invited bids upon the several items of said schedule. The board of commissioners of public grounds and buildings, on June 7, 1904, awarded to John H. Sanderson "the entire contract for the special furniture, carpets, fittings and decoration schedule for the equipment of the new capitol building, as set forth in each item from one to forty-one inclusive, on pages 55 and 56 of the special furniture schedule." William F. Snyder was the auditor general of the commonwealth and William L. Mathues the state treasurer, and each of these men, by virtue of his office, was a member of the board of commissioners of public grounds and buildings. James M. Shumaker was the superintendent of public grounds and buildings of the commonwealth. Sanderson, under his contract, did the work upon the fittings and decoration of the building, supplied large quantities of furniture, carpets and fixtures and, from time to time, presented invoices or statements of the amount due him for such work and articles supplied, upon which there were paid him very large sums of money. The several indictments averred that each of the defendants, respectively, was charged with some duty with regard to these invoices and charged that all the defendants had fraudulently conspired to defraud the state. The overt act charged in each indictment, in furtherance of such conspiracy, being the presentation, certification, settlement and payment of an invoice which was alleged to be fraudulent. The overt act alleged in the present case was the presentation, certification, settlement and payment of an invoice for 277 desks, which it was said contained 3,366¾ feet at $18.40 per foot, amounting to $61,948.20, purporting to be an invoice on account of the said Sanderson contract. The in-

dictment involved in No. 239, September Sessions, 1907, of the court below charged as the overt act, in pursuance of the conspiracy, the certification, approval, settlement and payment of an invoice for sofas, tables, etc., which was alleged to be false as to prices and measurements. The matters with regard to which the invoices in these cases, respectively, were alleged to be false and fraudulent, namely, measurements and prices, were the same, and the indictments are in other respects similar, each containing two counts, the first charging a conspiracy under the statute and the second charging conspiracy at common law. The legislation prescribing the duties of the several state officers with regard to the making and execution of contracts of this character was fully considered, and the circumstances connected with the preparation of this schedule, and the awarding of the contract thereon, the peculiar manner in which the articles were grouped in the several items of the schedule and the inferences which might fairly be drawn from the form in which the schedule was presented and the construction which the parties subsequently put upon it, were fully commented upon by this court in Commonwealth v. Sanderson, 40 Pa. Superior Ct. 416, and it is not necessary that we now repeat what was said in that case. We may now, therefore, proceed directly to the consideration of the specifications of error presented by this defendant.

The invoice upon which the indictment in the present case is based was for 277 designed special desks, some being roll-top, some flat-top and others typewriter desks, billed as containing 3,366¾ feet at the price of $18.40 per foot, aggregating $61,948.20. The invoice and the certificate which accompanied it, signed by this defendant, referred to "Item No. 24," but this was manifestly a clerical error, for "Item No. 24" provided for "Decorating and Painting, Series F" and fixed the price for the same at $2.52 per foot. The only item in the schedule the price of which was by the contract fixed at $18.40 per foot was "Item No. 22, Designed furniture, fittings, furnishings and decora-

tions of either wood-work, marble, bronze, mosaic, glass and upholstery, Series F" and under this item it is manifest, as is by all parties conceded, that it was intended to charge for these desks. The indictment charged that this invoice was false and fraudulent, among other things, in two respects, namely, that the desks were charged and paid for at the rate of $18.40 per foot, whereas in fact they ought not to have been charged and paid for at a higher rate than $10.80 per foot, and also, that the desks were charged and paid for as containing a number of feet greatly in excess of the number of feet which they contained. The defendant, upon the trial in the court below, formally entered an admission that the bill was false and fraudulent in the respects charged by the commonwealth, and that the other defendants in the indictment charged had presented, certified, settled and paid it in pursuance of a conspiracy to defraud the commonwealth. Having, through his counsel, entered this stipulation upon the record, "For the purpose of this trial only, and solely with a view to shorten its length," the defendant, through his counsel, thus stated the ground of his defense: "His contention is that he never was in any manner connected with or interested in such conspiracy." Defendant, through his counsel, formally conceded at the trial that the effect of the stipulation so entered upon the record was to admit that the contract between the state and Sanderson had been duly executed, and that, "Therefore, the mere proof of the passing of the contract is unnecessary, it is in evidence, it is in the indictment, it is conceded to be the contract."

The commonwealth introduced testimony establishing the contract under which Huston was employed, by the board of commissioners of public grounds and buildings, as architect, "to prepare plans and specifications and all detail drawings for all interior fittings, furniture, electric and gas fixtures for the new capitol building," the manner in which he discharged the duties arising out of that contract, the construction which he and the state officers put

upon his contract of employment and the duties arising from the same. The commonwealth also introduced evidence tending to show what the appellant had done in the preparation of the specifications for the work, the part which he had taken in preparing the schedule of 1904–1905 upon which the contract was awarded to Sanderson, the manner and form in which he had certified to the bills and invoices rendered by Sanderson, and as to the part which he had taken in supervising the execution of the contract between Sanderson and the state, and his action with regard to the particular invoice upon which the indictment in this case is founded. The contract between the state and Huston was evidenced by certain letters written by Huston to the board of commissioners of public grounds and buildings, by the recorded resolution of said board of commissioners and by a letter from the secretary of that board to this appellant. It was contended on behalf of the defendant in the court below that, under the written instruments constituting the contract, the only duties imposed upon the defendant were to prepare plans and specifications and all detail drawings for the fittings and furniture, and to exercise such limited supervision of the execution of the contract as would enable him to assure the officers of the commonwealth that the furniture supplied under the contract complied with the plans and specifications. The counsel representing the commonwealth conceded that this was the proper construction of the written contract standing alone, and the court below so held. The letter sent by this defendant to the board stating the terms upon which he would undertake the work of preparing plans and specifications and all detail drawings for the fittings and furniture of the building stated that his charge for such professional service would be 5 per cent on the cost of the work, and this letter specifically called the attention of the Board to page 760 of Kidder's Manual, a work on architecture, for the purpose of showing that the work would be economically done. The page of the book to which he thus called the attention of the board of com-

missioners of public grounds and buildings, contained under the heading "Charges and Professional Practice of Architects, General Provisions; For full professional services (including supervision), 5%, upon the cost of the work." The board of commissioners of public grounds and buildings after receiving this letter of Mr. Huston stating the terms on which he would undertake the work, elected him, as architect, for the purposes which had been indicated in their previous correspondence, and fixed his compensation at 4 per cent of the total cost of the work, which employment he accepted. That this defendant construed his contract to mean that it was his duty to exercise supervision of the execution of the contract, by whomsoever might become the contractor, is made evident by the specifications which he prepared and which became a part of Sanderson's contract with the state for in those specifications we find this provision: "Furniture . . . . Specifications of the work and material required in the furnishing, finishing and delivering in place in the building, the furniture for the capitol building at Harrisburg, Penna., according to the drawings, the 'Special furniture, carpet, fitting and decorating schedule,' and under the supervision of Joseph M. Huston, Architect, Witherspoon Building, Philadelphia, Pa." And following this, under the heading "General Conditions," we find this provision: "The contractor must personally supervise the work and shall at all times during its progress have a competent superintendent present to receive and carry out the instructions of the architect." These provisions this defendant, himself, wrote into the specifications which he prepared in pursuance of his employment and thus caused them to become a part of the contract between Sanderson and the state, which contract the defendant through his counsel at the trial stipulated should be considered as in evidence. The extent of the supervision required is not clearly defined in the written communications which resulted in the employment of the defendant. The learned counsel representing the defendant in the court below admitted, and here concedes, that

Huston was bound under his contract to exercise such supervision as would enable him to assure his employer, the state, that the furniture delivered had been made according to his designs and specifications. The learned counsel further concedes that Huston knew "that his approval of Sanderson's bills was necessary before payment of the same could be made by the Auditor-General" and upon page 99 of his paper-book thus states his position upon that point: "Of course, he knew that. The question is for what purpose were his certificates necessary. Defendant contends that they were necessary to establish delivery of the goods conformable to the plans and specifications, and for no other purpose." It being conceded that it was the duty of Huston under his employment to issue a certificate of some kind, it would seem to necessarily follow that the certificates which he thus issued must be true statements, or at least, for the purposes of this case, that he must not willfully and intentionally issue a certificate which he knew to be false. It may here be observed that this indictment does not charge Huston with a mere failure to do something which it was his duty to do, the charge is that he falsely, fraudulently and by collusion with the other persons charged, "then and there approved said fraudulent bill, then and there well knowing that the same was false and fraudulent, and fraudulently certified that the said John H. Sanderson was entitled to payment of the sum of sixty-one thousand, nine hundred and forty-eight dollars and twenty cents, for furnishing said above described desks, whereas, in truth and in fact the said John H. Sanderson was not entitled to payment of the said sum of sixty-one thousand, nine hundred and forty-eight dollars and twenty cents." This being the case it follows that the question as to the mere form of the certificate which Huston was required to issue, as indicated by the written communications which resulted in his employment, is not the controlling one in this case. If he was required to pass upon and certify to the amount of money which was due Sanderson upon the invoices rendered from

time to time and in the course of his employment fraudulently and by collusion with the other defendants certified an invoice which he knew to be false, for the purpose of defrauding the state, he would be guilty of the crime charged in this indictment.  If, on the other hand, the only duty with which he was charged was that of certifying that the furniture delivered complied with his plans and specifications, and in the course of his employment went further than his duty required and intentionally and fraudulently, by collusion with the other defendants, certified that Sanderson was entitled to receive a certain amount of money upon an invoice, which he knew to be false and fraudulent, for the purpose of defrauding the state, he would be equally guilty of the crime charged in this indictment.  In the latter case, the question would seem to naturally arise, Why had he gone out of his way to certify that which was not true?  The manifest purpose of furnishing any certificate was to supply evidence that Sanderson was entitled to be paid by the state the amount of his fraudulent claim.  An honest auditor general or state treasurer might properly accept the certificate as evidence that Sanderson was entitled to payment of the amount claimed, and a dishonest state officer could use the certificate as evidence that the payment was properly made, and thus disarm suspicion and mislead any person who might attempt to investigate the transaction.

The invoice in question was at the trial conceded to be false, both as to the price per foot and the number of feet at which the desks were charged.  Even had not this admission by the defendant been formally entered upon the record, it would have been the duty of the court, as matter of law, to charge the jury that under the contract the invoice was false as to the rate per foot at which the desks were charged; they were charged for at the rate of $18.40, net, per foot, and there was no warrant under the contract for charging for them at a rate higher than $10.80 per foot.  This defendant had approved that bill and there was attached to it a formal certificate signed by him.  The

formal full certificate was at the trial referred to as the "pink certificate." It was admitted in the court below that Huston went to Europe in the latter part of February, 1906, and before going away he signed and left at his office in Philadelphia a number of architect's certificates, signed in blank, to be used during his absence, and Sanderson, on March 30, 1906, went to the office of Huston, in Philadelphia, and presented the invoice in question, calling for the payment of $61,948.20 and asked for a certificate. A brother of Huston filled out the blank spaces in one of the certificates which Huston had signed and delivered the same to Sanderson, that certificate reading as follows:

"No. 702.           · Philadelphia, March 30th, 1906.
" Office of Joseph M. Huston, Architect,
      " Witherspoon Building.
      " I certify that John H. Sanderson is entitled to the payment of sixty-one thousand and nine hundred and forty-eight and twenty one hundredth dollars on account of his contract with the Commonwealth of Pennsylvania for interior fittings and furnishings under Item 24, being 3366¾ ft. at $20.00 less 8%—$18.40 per ft., delivered at capitol building, Harrisburg, Pa.
" 40th Order.
" $61,948–20/100.           J. M. Huston, Architect."

This certificate was attached to the invoice in question. There was upon the invoice in question at that time an affidavit of Sanderson averring the correctness of the charges. There was a dispute under the evidence as to whether James M. Shumaker, the superintendent of public grounds and buildings, and one of the parties here jointly charged, had approved this invoice prior to the certification by Huston or afterwards. This defendant arrived here, upon his return from Europe, on April 2, 1906, and shortly after that date and before the bill was paid he wrote upon the face of this false invoice, and immediately below the footing which consisted of "Item Number 24,

3366¾ ft., at $20.00 less 8%—$18.40, $61,948.20," and
with the pink certificate, which had been filled out over
his signature, during his absence, before him: "Approved;
Joseph M. Huston, Architect."

The bill was subsequently settled and paid by the au-
ditor general and state treasurer. It was conceded in
the court below that the words "Approved, J. M. Huston,
Architect," written in his own hand upon the face of the
invoice, were intended by him and the other parties acting
on the invoice to stand as the equivalent of the full form
of the pink certificate and that they were thus placed upon
the invoice to serve as the equivalent of the pink certif-
icate, in case the latter should become detached and lost.

What did the certificates of this defendant, written upon
and attached to this fraudulent invoice, mean? The certif-
icates were in writing and had this been a civil proceeding
it might have been the duty of the court below to pass
upon their meaning as a question of law. The "pink cer-
tificate" attached to the bill specifically states that "John
H. Sanderson is entitled to the payment of sixty-one thou-
sand and nine hundred and forty-eight and twenty one
hundredth dollars on account of his contract with the
Commonwealth of Pennsylvania," and the concluding
part of the certificate, referring to the item number of the
schedule and the measurement of the furniture simply
shows the means of computation by which the amount was
arrived at. The latter part of the certificate, referring to
the item number of the schedule, the measurement of the
furniture and the price per foot, seems to have been merely
copied from the footings of the invoice, but it at that time
clearly revealed to the person who issued the certificate
the manner in which the amount due Sanderson was ar-
rived at. One important fact is that the certificate dis-
tinctly stated that Sanderson was entitled to the payment
of a specific sum of money; and equally important is the
fact that the certificate failed to state that the desks in
question complied with the plans and specifications pre-
pared by the architect. With this certificate before him

attached to the invoice, this appellant wrote upon the invoice the word "Approved," and thereto signed his own name, as architect. Here again we find no distinct certification that the desks complied with his plans and specifications. Had the meaning of these certificates been a question of law for the court, there would certainly have been ground for holding that they meant that John H. Sanderson was entitled to payment of the sum which he claimed under this fraudulent bill or invoice. This was not a civil case, however, and the intention of this appellant, in the action he took with regard to this invoice, was a question to be passsed upon by the jury under all the evidence in the case. The appellant did not become a witness in the case, and the court and jury did not have the advantage of his own explanation of what meaning he intended these certificates to convey and the effect which it was his purpose they should have when presented to the board of commissioners of public grounds and buildings, as evidence that Sanderson was entitled to payment of this claim. The appellant did, however, call as witnesses a number of architects who testified that the appellant, under such a contract as that between him and the state, was not required to certify to the correctness of Sanderson's invoices, that he was only required to certify that the furniture complied with his plans and specifications, and that under the usage and practice of the profession of architects the certificates of Huston attached to the invoice in question only meant that the furniture referred to in the invoice complied with his designs and specifications and would not mean and ought not to be taken to mean as certifying that the contractor was entitled to payment of a specific sum of money. This evidence tended to support the contention of the appellant that, under the duties arising out of his contract and the usages of the profession of architects his certificates had a meaning different from that which the words therein written conveyed. The commonwealth, in rebuttal, called an equal number of architects who testified that, under the usages of the profes-

sion and such a contract as that evidenced by the written communications in which the employment of the appellant had its origin, the appellant was not required to pass upon and certify the correctness of Sanderson's invoices, that he was only required to certify that the furniture complied with his plans and specifications, but they also testified that, under the custom of the profession, an architect is responsible for the correctness of whatever facts are stated in his certificate, that when an architect certified there was a certain amount due a contractor the architect would be required to make the investigation necessary to ascertain the amount due, that his certificate that there was a certain amount of money due the contractor was in the nature of a check or draft on the owner, that it was the universal custom of the profession that when an architect certified to a thing he must first ascertain the accuracy of what he certified to, that an architect's certificate must be taken to mean what it says, that when he certifies a bill or invoice he is responsible for the amount of the bill, and that the certificates attached to this bill meant that there was a specific sum of money due Sanderson, the contractor, and did not merely mean, under the usage and custom of architects, that the furniture complied with the plans and specifications. The propriety of the admission of this testimony as to the usage in the profession of architects and the meaning of these certificates in that profession is not questioned by any specification of error and we must assume it to have been properly before the court. In view of this conflicting evidence and with the certificates themselves before him, it certainly was not competent for the learned judge of the court below to declare as matter of law that the defendant only meant to certify that the desks in question had been made in conformity with his designs and specifications and that he had not meant to certify that Sanderson was entitled to a specific sum of money. The question of the meaning which the defendant intended his certificates to import was for the jury and in passing upon that question it was certainly competent for

the jury to consider the words and figures which appeared upon the face of the certificates. The question was submitted to the jury in a manner of which the appellant has no reasonable ground for complaint and the first specification of error is overruled.

The second specification of error is based upon the allegation that the charge of the court was inadequate, "in that the Commonwealth's testimony was referred to with undue prominence and in detail, while the defendant's testimony was inadequately presented to the jury." The learned counsel representing the appellant had presented to the court thirty-six points, requesting specific instructions upon questions arising out of the evidence, and the general charge of the court was so full and satisfactory to the defendant that eighteen of those requests for specific instructions were withdrawn, and all of the remaining written requests, except the thirty-sixth which prayed for binding instructions in favor of the defendant, were affirmed by the court below. The complaint in this assignment of error is not that the court did not fully instruct the jury as to the law applicable to the facts established by the evidence; it is that the court did not fairly review the evidence and failed to adequately present to the jury the testimony produced by the defendant. When dealing with a specification of error of this character, no particular error of law or material misstatement of the evidence being pointed out, the court will be reviewed on the general effect of the charge, and not upon isolated sentences or paragraphs disconnected from the context which qualifies and explains them; if, as a whole, the charge was calculated to mislead there is error; if not there is no ground for reversal. The introduction of testimony at the trial in the court below began on April 5, 1910, and was not concluded until the twenty-fifth day of the same month, many witnesses had been called and a mass of documentary evidence had been submitted, for the court below to have referred to all this testimony in detail would have been not only undesirable, but unreasonable and impossible. The learned

judge was not required, in his charge, to go over all the evidence on any particular point every time he referred to that point in the course of his charge. It was enough if he gave to the jury a general review of the evidence on the one side and on the other, which fairly and adequately presented the respective contentions of the parties, with enough reference to the items of evidence to assist the jury in recalling it as a substantial whole, and to appreciate its bearing. We have carefully considered all the testimony produced at the trial in the court below, and are convinced that the charge of the court, in reviewing the evidence and presenting the contentions of this defendant, was absolutely fair and impartial and as full as could reasonably be desired. The learned judge of the court below, after having fully and fairly in his charge presented the contentions of the appellant and answered the written requests for instructions gave to counsel for appellant, out of an abundance of caution, an opportunity to have then and there corrected any misstatement or omission in referring to the evidence, in the charge, which in the opinion of counsel required correction. The court, addressing counsel, said: "Is there anything necessary to be said to the jury which I have omitted?" The complaint in the specification of error with which we are now dealing is not that the court made any misstatement but that it omitted to say something which it ought to have said, relating solely to the review of the evidence. If the charge which had been delivered was fairly the subject of a complaint of this kind, that was the time at which counsel for the defendant ought to have asked that the omission be corrected. The fair inference is that counsel did not at that time consider the charge inadequate, and we are unable to so pronounce it after careful consideration. The second specification of error is dismissed.

The intention of the defendant in certifying the invoice, which is now admitted to be false and fraudulent, was the important question upon which the jury were required to pass. What meaning did he intend his certificates to con-

vey to those who might afterwards deal with the invoice? What effect did he intend those certificates to have? What was his purpose in assisting to produce that effect? It was proper for the jury, in passing upon these questions, to inquire as to the duty which the defendant had assumed with regard to invoices rendered by Sanderson under his contract; in so far as that fact might tend to throw light upon his intention when he certified the invoice in question. In determining the duty which Huston had undertaken with regard to these invoices and his relation thereto, it was proper for the jury to consider not only the letters and resolutions in which the employment of Huston by the state had its origin, but also the construction which Huston himself and all the parties to the transaction had put upon that contract. "When we are asked to say what the parties meant or intended by their contract, it is entirely safe to point to their own construction of it, as evidenced by their course of dealing under it:" People's Natural Gas Company v. Braddock Wire Company, 155 Pa. 22; Firth & Foster Bros. v. Hamill, 167 Pa. 382; Commonwealth v. Sanderson, 40 Pa. Superior Ct. 416, 460. The Commonwealth had produced evidence which tended to establish that this defendant had, prior to and at the time of his action upon this invoice, construed his own contract with the state to mean that it cast upon him the duty and conferred upon him the power to pass upon the correctness of the measurements and prices of the furniture supplied by Sanderson under his contract, and the amount of money which he was entitled to receive on account of the invoices presented. The defendant had recognized the importance and materiality of the meaning of his certificates to the determination of the issue being tried, and had introduced the evidence of expert witnesses, as to the meaning, in the profession of architects, of certificates worded as were those in question. The instructions of the court to the jury, in the language which is the subject of the third specification of error impartially referred to the testimony relating to these questions and clearly indicated

its bearing upon the issue being tried. We find no merit in the third specification of error.

The contention of the defendant, by his counsel, all through the case was that he did not mean by his certificates upon and attached to the invoice in question that Sanderson was entitled to receive from the state the amount stated in the invoice, that what he meant to certify was that the articles conformed to his plans and specifications, that although the invoice was false as to the measurement, the price per foot at which it was charged and the total amount claimed by Sanderson, the certificates of the defendant were neither false nor fraudulent, that such certificates were true in that he only intended them to mean and under the usages of the profession of architects they only did mean that the furniture referred to in the invoice conformed to his plans and specifications. Whether this contention was made in good faith was a question for the jury, and any evidence directly bearing upon the good faith of that contention was properly admissible. It was, therefore, competent for the commonwealth to prove that the desks in question were not specially designed desks and had not been made in accordance with designs and specifications prepared by the defendant, Huston. The commonwealth produced as a witness G. L. Holton, superintendent of the factory of the Derby Desk Co., who testified that all of the desks involved in this invoice had been made by the Derby Desk Co., that a large number of the desks involved in this invoice were not specially designed desks, but were stock articles supplied from the catalogue of the Derby Desk Co., the designs for which had been prepared exclusively by employees of that company; and that as to all the other desks included in the invoice, they had been made by combining certain features of other desks in the catalogue of the Derby Desk Co. from designs and specifications made by employees of that company, and that all of the desks had been made without any reference to Huston's designs or specifications. The witness further testified that no designs or

specifications made by Huston had ever been furnished to the manufacturers of these desks, and that the manufacturers had never received any instructions from Huston or his representative with regard thereto, and knew nothing about any plans and specifications prepared by Huston. This evidence went directly to the question of the good faith of the contention of the defendant that he believed he was certifying and only intended to certify that the articles conformed to his plans and specifications. The language of the court which is complained of in the fourth specification of error limited the effect of this evidence to the consideration of that question, in a manner of which the appellant has no just ground for complaint. The fourth and sixth specifications of error are dismissed.

The fifth specification of error refers to the admission in evidence of four of the desks charged for in the invoice in question, and of the testimony of the superintendent of the factory at which these desks were made, as to the sizes of the desks, respectively. The desks and the testimony with regard to them revealed that two desks of exactly the same size, each being five and one half feet long were charged for in this invoice, one as containing twenty feet at $18.40 per foot, $368, and the other as containing fifteen feet at $18.40 per foot, $276. Of the other two desks No. 3 was charged as containing sixteen and one half feet at $18.40 per foot, $303, and No. 4 was charged as containing seven and one half feet at $18.40 per foot, $138. The only practical difference in the size of these desks was that No. 4 was three inches longer than No. 3, yet No. 3, the smaller desk was charged as containing sixteen and one half feet, while No. 4, the larger of the two desks, was charged as containing seven and one half feet. These desks and the evidence explanatory of them clearly demonstrated that the prices charged for these desks in the invoice had no relation whatever to the size of the desks, their length, the number of square feet of surface, or the number of cubic feet which they contained; the prices had been arbitrarily fixed without regard to the number of

feet which the desk contained, and then the number of feet stated in the invoice had been simply made to suit the price. The evidence clearly disclosed that the desks had been charged for at a number of feet greatly exceeding their length and at prices grossly exorbitant. Any dealer or private individual could have bought these same desks from the catalogue of the Derby Desk Co. at prices varying from one-third to one-half of what the state paid under this invoice. This testimony not only established that the invoice in question was false as to measurements, but that it was so flagrantly false that its fraudulent character must have been known to any one who made the slightest attempt to ascertain its accuracy. The fifth specification of error is overruled.

The seventh specification of error refers to the admission in evidence of a letter written by the appellant to Henry C. Mercer. Mr. Mercer was the only manufacturer of "Moravian" tile in America, he had entered into an arrangement with the defendant, Huston, to supply the Moravian tiling for the main floor of the capitol building at $1.03 per square foot, which arrangement was in force at the time of and after the schedule of 1904–1905 had been approved. The Moravian tiling for the main floor of the capital building had been arranged for by the capitol building commission, and did not come under the present contract. The appellant, as architect, contemplated introducing Moravian tiling in certain of the work to be done under the contract to be awarded upon the schedule of 1904–1905, by the board of commisioners of public grounds and buildings. He caused to be incorporated in that schedule "Item No. 41, Moravian tiles, Series F., maximum price $3.00 per foot." The specifications which this defendant had prepared and upon which any contract let upon the schedule would be based, contained the following provision: "Moravian tile work, specifications; "Of the work and materials required in the furnishing, finishing and erecting in place the Moravian tile work for the capitol building at Harrisburg, Penna., according

to the drawings, the 'special furniture, carpet, fitting and decorating schedule,' and under the supervision of Joseph M. Huston, architect." Under these specifications we find the following provision: "These tile floors shall have special centre panels illustrated historical subjects, which panels shall be selected by the architect and furnished, set in place and pointed by the manufacturer so as to obtain the most artistic results. All other border and field work shall be set by the contractor for the tile work and pointed with best quality Portland cement in the most careful manner and as directed by the architect." It thus appears that no matter who obtained the contract certain parts of the work of setting in place and pointing the tiles must be done by the manufacturer. This provision rendered it almost necessary that the contractor must obtain the tiles from Mercer, who was the only manufacturer in this country. It would, therefore, seem manifest that any contractor who bid upon that item must necessarily have information from Mercer as to the rate at which the latter would make and set the tiles. If Mercer withheld such information the contractor could not bid upon that item. This being the case the appellant wrote the letter in question, after the schedule had been approved but before the last day for bidding had arrived, and sent a copy of the schedule to the witness. The letter contained the following language: "I sent you under separate cover a schedule for the next year's supplies for the state, and on page turned down and marked you will see the reason for my note of the other day. As something must be bid off the maximum I do not want you to quote any lower. This is intended to pay for the extra floor I want, i. e., the governor's executive reception room where Miss Oakley paints, and other hearths &c." The schedule of 1904–1905 referred to in the letter was received by Mercer, and offered in evidence in connection with the letter. The commonwealth offered to prove by Mercer, in connection with the letter, that he never knew John H. Sanderson in the transaction and never gave him any quotation on Moravian tiles, and

never communicated with Sanderson or received any communication from him. This testimony was offered "in connection with the evidence already in, showing that Sanderson had bid 25% off the maximum price of $3.00 per foot on Item No. 41 in the schedule, being the item for Moravian tiles; for the purpose of showing collusion between Huston and Sanderson and that Huston attempted to make an arrangement with Mercer that would prevent competitive bidding on this item of the schedule, and for the purpose of showing that Huston was a party to the conspiracy between Sanderson and others to defraud the commonwealth." It will be noted that Huston, referring to the schedule, wrote to Mercer: "As something must be bid off the maximum I do not want you to quote any lower." The maximum referred to is manifestly the $3.00 per square foot fixed in the schedule as the price beyond which the state would not pay. The letter explicitly refers to the schedule and the word "maximum" manifestly refers to the price fixed in the schedule, off of which bidders were required to bid a certain percentage. This letter meant and only could mean a request from Huston to Mercer not to "quote" any lower than the maximum price. This was not a mere request that Mercer would not bid to furnish the tiles to the state at a lower price but that he would not "quote" a lower price. If Mercer complied with this request he would have refused to quote a price lower than $3.00 per square foot to any prospective contractor who contemplated submitting to the state a bid upon that item. No person could safely bid upon that item who had not in some way obtained information as to the rate at which he could secure the tile from Mercer. Mercer had had no communication with Sanderson whatever, but the evidence clearly established that Sanderson had at that time been in consultation with Huston. We are of opinion that, taken in connection with the testimony of the witness Wilson and the other evidence in the case tending to show that Huston and Sanderson were then in consultation and that the former was then assisting

the latter in securing the contract upon the schedule of 1904–1905, the letter to Mercer and the testimony offered in connection therewith were properly admitted in evidence. This letter was admissible also for the purpose of contradicting the statement in the letter of Huston to Attorney General Carson, in which he stated that no understanding existed between him and the contractor, Sanderson, before the contract was awarded to the latter, as well as to show collusion between them in the preparation of this schedule. In the case of Commonwealth v. Sanderson, 40 Pa. Superior Ct. 416, we commented at length upon the form in which the schedule of 1904–1905 was prepared, the unusual and ambiguous grouping of articles therein, the numerous provisions in the items of the schedule for the payment of furniture at so much per foot without indicating what system of measurement was to be applied, and the inferences fairly arising from the terms of the schedule and the construction which the several defendants put upon the contract when they came to pass upon the invoices of Sanderson, and what we there said need not now be repeated. Anything that showed the relation of this defendant to any one of those jointly indicted with him in connection with the preparation of the schedule, the events which led up to the awarding of the contract, the actual award of the contract and the subsequent course pursued by all the defendants in the execution thereof, are proper to be considered in a case of this character. The seventh specification of error is dismissed.

The eighth specification of error refers to the admission in evidence of the "Quantities Plans." These plans had been prepared by this defendant. The plans taken together covered every room in the capitol building; each one of the plans represented a floor of the building and the division thereof into rooms or departments and upon the plan were indicated by symbols the several articles of furniture or decoration which were to be supplied to that room or department by Sanderson under his contract. These plans were submitted by the appellant to the board

of commissioners of public grounds and buildings and were by that board approved on December 13, 1904. Prior to the preparation and adoption of these plans the number or quantity of the various articles which Sanderson was to supply under the various items of the schedule of 1904–1905 had not been fixed. The preparation of these plans by the defendant threw light upon the construction which he put upon his own contract of employment by the state; the plans were evidence that he construed his contract to mean that he was at least required to advise the board as to the number or quantity of articles which Sanderson should be called upon or permitted to furnish under the schedule of 1904–1905, even if the plans did not show that Huston assumed to himself the power, under his contract, of determining the number and quantity of the articles which Sanderson should be permitted to supply and charge for at the rates fixed by the schedule. The effect of the preparation and approval of these plans was to give Sanderson a free hand to supply furniture alleged to be specially designed to every room in the capitol building. The plans further indicated that the appellant had assumed the power and duty of determining the item number of the schedule under which certain work should be done and paid for, for these plans indicate that certain decorations were to be classified and paid for under "Item No. 30" of the schedule, at the rate of $100 per foot. The plans were properly admitted as evidence of the extent of the supervision which this appellant had undertaken to exercise and did exercise over the execution of the contract between Sanderson and the state, and the eighth specification of error is overruled.

The ninth specification of error relates to the admission in evidence of two architect's certificates, issued and signed by this defendant personally, in the following words and figures, namely:

"No. 501.                Philadelphia, July 9th, 1904.
    "I certify that John H. Sanderson is entitled to the pay-

ment of fifty thousand dollars, on account of his contract with the Commonwealth of Pennsylvania, for interior fittings and furnishings of the capitol, at Harrisburg, Pa.

"First Order.

"$50,000.00                    J. M. HUSTON, Architect."

"No. 507.              PHILADELPHIA, August 4th, 1904.

"I certify that John H. Sanderson is entitled to the payment of seventy-five thousand dollars, on account of his contract with the Commonwealth of Pennsylvania, for work done on interior fittings and furnishings of the capitol at Harrisburg, Penna.

"2nd Order.

"$75,000.00.                   J. M. HUSTON, Architect."

The offer of these certificates was accompanied by the offer of the explanation of these transactions given by this defendant in a letter to Attorney General Carson, dated January 7, 1907. "My recollection in connection with this matter is that John H. Sanderson requested the Auditor-General, who had been authorized by the board to pay for this work, to make such advancements on account of the articles manufactured, which could not be delivered to the building on account of there being no suitable place to put them, and also for a large amount of work in course of manufacture, and offering to furnish the state a trust company's bond covering such advances. The Auditor-General asked me about it, and I said that I saw no reason why such advances could not be made under the conditions. He then requested me to issue the necessary certificates for the amount requested, and I did so." No invoice or bill for furniture accompanied these certificates, no furniture had been delivered for which Sanderson was entitled to payment, even if the explanation of the defendant be accepted as true, the payment of the amounts mentioned in these certificates involved a payment in advance, "for a large amount of work in course of manufacture." These certificates could not by any stretch of the imagination be construed to mean that this defendant was merely

certifying that furniture had been delivered to the state
or was ready for delivery to the state which complied with
the plans and specifications of the architect; for the fur-
niture was only "in course of manufacture." There was
no attempt made to connect these certificates with any
particular furniture. The defendant said in his letter to
the attorney general that the auditor general had been
"authorized by the board to pay for this work," but this
was not true, for it was not until January 10, 1905, that the
board of commissioners of public grounds and buildings
authorized the auditor general to make payment to Sander-
son upon the certificate of the architect, Huston. The
letter of the defendant to the attorney general reveals
that he knew that his certificates were necessary in order
to enable Sanderson to get the money. These certificates
show further that the contention of the defendant at the
trial that he merely intended to certify that the furniture
complied with his designs and specifications and that he
relied upon the certificates of Shumaker, the superintend-
ent of public grounds and buildings, as to the measurement
of the furniture and the correctness of the amounts of
Sanderson's invoices, was not made in good faith. Shu-
maker had not certified any invoice to which this certificate
could be referred, he had issued no certificate in connection
with the transaction. The board of commissioners of
public grounds and buildings never approved or ordered
the payment of the amount mentioned in either of these
certificates. This defendant simply issued the certificates
and upon the certificates alone the auditor general and
state treasurer settled, approved and paid the amounts
mentioned in the certificates to Sanderson. The $50,000
paid under the first certificate was, it is true, deducted
from the amount of an invoice presented by Sanderson in
May, 1905, and the amount involved in the $75,000 cer-
tificate was deducted from a like invoice rendered in June,
1905, but in the meantime Sanderson had presented, this
defendant had personally certified, and the auditor general
and state treasurer had settled, approved and paid in-

voices amounting to over $600,000, without taking into consideration or referring to the $125,000, which had been paid in advance. Even if the letter of this defendant to Attorney General Carson, in so far as it refers to these transactions, be left entirely out of consideration, the facts plainly appear that this defendant had certified that Sanderson was entitled to the payment of $125,000, that those certificates did not refer to any particular furniture and could not have been intended to mean that any particular furniture was made in accordance with the designs and specifications of the architect, that at least a part of the furniture was then only in course of manufacture, that the amounts thus paid were advance payments made in violation of law, and that in these matters the defendant could not have been misled by any certificate of Shumaker, for the reason that Shumaker did not certify. These were the first certificates that this defendant issued under the Sanderson contract; they bore the numbers "501" and "507," and it is manifest that these numbers do not refer to the serial number of certificates issued under the Sanderson contract. These numbers may have been the regular serial numbers in the general issue of certificates from the office of the defendant, or they may have borne the numbers in the list of certificates issued in connection with all the contracts relating to the building of the state capitol and its furnishing. The $50,000 certificate, which bore the number "501," is upon its face, however, designated as "First Order." The $75,000 certificate, which bears the certificate number "507," is designated upon its face "2nd. Order." These were in fact orders for the payment of money, and they were the first and second such orders which this defendant had issued under the Sanderson contract. The fact that he designated them "First Order" and "2nd. Order" would seem to indicate that he understood them to be just what they in fact were, orders for the payment of money. These certificates were properly admitted in evidence, as tending to show the construction which this defendant put upon his own contract with the

state, the duties and powers which he assumed to discharge and exercise under that contract, the meaning which he intended his certificates to convey and the effect which he expected them to produce, in assisting Sanderson to obtain money from the state treasury. They were admissible for the reason, also, that the invoice, the certification, settlement and payment of which is charged as the overt act in this indictment, was rendered under the contract awarded by the state to Sanderson upon the schedule of 1904–1905. The evidence relating to that contract, the construction which the defendants had put upon it, the manner in which they had dealt with prior invoices rendered by Sanderson, and the irregular manner in which they had paid him money under color of the alleged contract, were properly admissible in evidence, as tending to show that the last act was part of a series and the result of an unlawful combination; that the act charged in the indictment was but one of a connected series of frauds, intentionally committed, and not attributable to mere negligence or mistake: Commonwealth v. Bartilson, 85 Pa. 482; Neff v. Landis, 110 Pa. 204; Commonwealth v. Sanderson, 40 Pa. Superior Ct. 416, 473. The ninth specification of error is overruled.

The tenth specification of error is based upon the refusal by the court of the defendant's thirty-sixth point, which prayed for binding instructions in favor of the defendant. We are of opinion that the point was properly refused. The commonwealth had produced evidence which established that in prior invoices rendered by Sanderson under this contract desks precisely similar to those covered by the invoice upon which this indictment was founded had been charged for by him, certified by this appellant, and settled, approved and paid by the other parties charged, under item 27 at the rate of $10.80 per foot. This evidence also disclosed that no consistent system of measurement had been adhered to in determining the price to be paid by the state for the desks furnished under the contract, desks which were of the same

size and similar in all respects were, respectively, charged, certified and paid for as containing a number of feet which greatly varied. The desks offered in evidence by the commonwealth, as exhibits No. 28 and No. 29, presented a fair example of this remarkable system of measurement. The desk, exhibit No. 29, had been furnished to the commonwealth under an invoice dated January 4, 1905, and was charged, certified, settled and paid for under item No. 27, at $10.80 per foot, as containing sixty-four feet, amounting to $691.20, and a number of similar desks covered by the same invoice had been billed, certified and paid for as containing the same number of feet and at the same price. This invoice had been personally certified by this defendant. The desk, exhibit No. 28, and a number of other desks covered by the invoice referred to in the indictment were the same size and practically similar to the desk, exhibit No. 29, but these desks, instead of being charged as containing sixty-four feet were charged, certified and paid for as containing twelve feet each, and instead of being charged under item No. 27 at $10.80 per foot, they were charged and paid for under item No. 22 at $18.40 per foot, or $220.80 each. This evidence at once raised a question for the jury, as to whether the defendant innocently and honestly certified that Sanderson was entitled to receive the amount which he claimed for the desks covered by the invoice referred to in the indictment. There was in this case evidence sufficient to warrant a finding that this defendant prepared or actively assisted in the preparation of all the items in the special furniture schedule from No. 21 to No. 41, inclusive. The testimony of the clerk who prepared the general schedule for 1904–1905 was that this defendant and Shumaker, in company, brought to him, while he was engaged upon his work, these twenty-one items and that Shumaker, in the presence of Huston, instructed him to incorporate those items in the special schedule. The letter of Huston to Mercer established that the former was familiar with the provisions of the schedule before the contract had been

let upon it.   Two letters written by this defendant, one·
dated November 19, 1906, and the other January 7, 1907,·
to Attorney General Carson distinctly admit that this
defendant assisted in the preparation of the items of the
schedule from No. 21 to No. 41, inclusive.   The learned
counsel representing the defendant has earnestly con-
tended that the evidence produced by this defendant as
to the circumstances under which the defendant signed
these letters, relieves the defendant from all responsi-
bility for their contents and deprives the letters of all
value as evidence in this case.   The first letter was writ-
ten in reply to a letter addressed by the attorney general
to Huston, on November 12, 1906, and there is no ques-
tion that the reply was signed by Huston with his own
hand.   With regard to this letter and the circumstances
under which it was written and signed the defendant
called his associate, Mr. Stanford B. Lewis, to testify.
Mr. Lewis said that he had received and opened the letter
addressed by the attorney general to Huston, that the
defendant had never seen that letter and that he, Lewis,
prepared the reply, dated November 19, 1906, which the
defendant signed without being aware of its contents.
The commonwealth had proved that the signature to the
letter was that of this defendant.   When a man signs his
name to a letter the implication arises that he adopts as
his own the statements in the letter contained.   The tes-
timony of the witness Lewis was the only evidence of-
fered tending to relieve the defendant from responsibility
for the statements contained in this letter.   The defend-
ant, who signed the letter, withheld from the jury any
light which his own testimony might have afforded upon
this question.   The letter of January 7, 1907, was written
in reply to a letter of the attorney general addressed to
Huston dated December 15, 1906.   Mr. Lewis testified
that he also received and opened this letter from the
attorney general and that the defendant never saw it,
that he, Lewis, prepared the letter signed by the defend-
ant on January 7, 1907, and the defendant was not aware

of its contents, having signed it without reading and without explanation. Three other witnesses testified, as to this letter, that they were present when it was signed by the defendant and that he did not then read it nor was it then read or explained to him. It may here be observed as to these three witnesses, that they testified only as to what occurred at the actual signing of the letter by the defendant. Three weeks had intervened between the date of the letter written by the attorney general and the final signing of the reply by this defendant. As to what consultations the defendant may have held with Lewis, what directions the defendant may have given as to the preparation of the reply, or whether the reply was actually dictated by the defendant, the testimony of the witness Lewis stands alone. The admission of these letters in evidence is not even assigned for error by the defendant. The letters were properly admitted in evidence, and the explanation of the witness Lewis, as to the knowledge which the defendant had of their contents, was proper to be considered by the jury, in determining the weight to be given the letters as evidence. In these letters the defendant says, in explaining the meaning of the term "per foot" in the schedule, which he characterizes as the "unit price" system: "I appeared before the Board, as stated in my last letter, and explained to them, to the best of my ability, my ideas in relation to the 'unit price' system; the Board adopted my suggestions and directed its superintendent to compile them in the schedule. I assisted the superintendent in compiling items 21 to 41, inclusive. I did not suggest or compile the items from 1 to 20, inclusive, because they did not cover the work designed by me." The defendant had, in his letter of November 19, 1906, said: "This method is generally used by the trades in making up prices for bids, and is the common practice all over England." "I know in the practice of the arts, in all lines, the 'per foot' rule is applied for determining of costs, and in the giving of bids by the above rule for wainscoting, bookcases, wardrobes,

mantels, over mantels, cabinets, etc., and in the schedule of 1904, the items for specially designed furniture for the new capitol building were framed to extend this principle to tables, chairs, desks and other articles of furniture," and in this earlier letter the defendant had stated that he did not suggest any of the first twenty items in the special schedule, but explains: "I was asked by the Board to prepare such items only as would be required for the special furniture and fittings which would come under my supervision." If these statements were true this defendant took an active part in having the contract so framed that the contractor would be paid for sofas, chairs, desks, tables and various other kinds of furniture at so much per foot, without specifying whether it was by the lineal foot, square foot of surface or cubic foot, and thus leaving the contractor, the architect and the state officers free to interpret the contract in such a way as to permit them to pay to the contractor almost any price for the furniture that his cupidity might dictate. These letters assert that this defendant assisted Shumaker, the superintendent of public grounds and buildings, in compiling items 21 to 41, inclusive. Those items were so worded as to preclude a person who desired to submit a bid from attempting to do so, unless he had an understanding with the architect and the state officers as to what construction they would put upon the meaning of the term "per foot." The letter of January 7, 1907, shows that the defendant construed his contract with the state to impose upon him the duty and invest him with the power to pass upon and ascertain the correctness of the measurements of the various articles of furniture and determine the item number under which they were to be classified and the prices which should be paid for them. This letter states that the "item No. 27, designed special desks and tables, per foot $12.00, maximum price," upon which Sanderson bid ten per cent off—$10.80, was intended to cover the furniture in clerical departments, and that this appellant fixed the maximum price after consultation

with his associate, Mr. Lewis.  The letter says: "These desks and tables were subsequently compared with stock articles of similar character, and a price allowed which was less than their price and the number of feet allowed was less than the articles actually measured."  This letter expressly asserts that the defendant did assume responsibility for measurements and did actually measure the various articles, or a sufficient number of each class of articles to enable him to pass upon the correctness of the invoices.  The letter attempts to justify all the payments that were made under the Sanderson contract and if its statements had been accepted as true it would have put an end to the investigation.  The commonwealth introduced testimony tending to show that many of the statements contained in these letters were false and fabricated and were made for the purpose of concealing the facts from the attorney general, thwarting his investigation and diverting suspicion from Huston and the other defendants.  We held in Com. v. Sanderson, 40 Pa. Superior Ct. 416, that evidence as to the manner in which the schedule was prepared, the indefinite language in which the various items were expressed, the adoption of the indefinite term "per foot," without indicating the manner in which the measurement was to be made, the effect which the parties subsequently gave to the vague provisions of the contract, and all their actions thereunder, were proper for the consideration of the jury and sufficient to sustain a finding that the overt act charged in the indictment was part of a consistent and continued system of fraud.  The question of the guilt or innocence of this defendant was for the jury and the tenth specification of error is dismissed.

The eleventh, twelfth and thirteenth specifications of error relate to the verdict, and may be considered together.  The only finding which was received by the court, recorded and affirmed by the jury as their verdict was "Guilty as indicted," with a recommendation to leniency on the part of the court in pronouncing sentence.  This

verdict was responsive to the issue, unless invalidated by the incidents which preceded it. Prior to the rendition of this verdict, the jury after being charged and having spent some time in deliberation, came into court; the clerk addressing the jury, said: "Gentlemen, have you agreed upon a verdict?" The foreman of the jury replied: "We have," and tendered to the court, as the verdict of the jury the following, indorsed upon the indictment, "We find the defendant guilty of defrauding the Commonwealth," signed "Edwin S. Farver, Foreman." Having read the finding, the court inquired: "Gentlemen, do you mean by this that you find the defendant guilty of the conspiracy charged in the indictment?" The foreman replied: "No, sir." The colloquy then proceeded thus:

The Court: "You must determine—the question for you to determine is whether he is guilty of the conspiracy charged in the indictment. You mean by this, you find him guilty of the charge contained in this indictment?"

The foreman: "It is changed, don't you see?"

The Court: "You say the defendant is guilty of defrauding the Commonwealth. We ask you whether you mean by that, whether you find him guilty of the charge contained in this indictment. Is that what you mean?"

The foreman: "We let the conspiracy off, we agreed to let the conspiracy off."

The Court: "The question to determine is, whether he was guilty of the conspiracy."

The foreman: "That is what we would not agree."

The Court: "Have you considered that?"

The foreman: "Yes, sir: and we agreed that there was no conspiracy; we have agreed on that."

The Court: "The question for you to determine is, whether the defendant is guilty of the conspiracy charged in the indictment, being a party to the conspiracy charged in the indictment to defraud the Commonwealth. That is what you mean?"

The foreman: "They all agreed; that is the only way they would agree."

The Court then said to the jury: "We will have to send you back, and you will have to determine the question before you.   This indictment charges the defendant with having conspired with the other persons named in the indictment to cheat and defraud the state by means of the false bill set forth therein.   That is the question you are called upon and you are sworn to determine.  If you have not considered that or reached a determination upon that you may retire and consider that question.   The charge is that of conspiracy, with having acted in concert with the other persons named in the indictment to cheat and defraud the Commonwealth in the manner set forth, pursuant to an understanding between him and the others." Mr. Graham, of counsel for the defendant, then said to the court: "If they are not guilty of the conspiracy they are not guilty of anything."   In response to which suggestion, the court further said to the jury: "If he is not guilty of the conspiracy, if he is not guilty of the charge in the indictment, then you say so by your verdict.   If he is guilty, if you are satisfied beyond a reasonable doubt that he is guilty of conspiring with the others to cheat and defraud the Commonwealth by means of the false bill set forth therein, you say so by your verdict.   Suppose you retire and consider that."   The jury then retired for further deliberation.   Immediately after the jury had so retired counsel for the defendant made the following motion: "Whereas, the foreman in behalf of the jury announced that they had agreed that the defendant was not guilty of conspiracy, I ask that that be recorded as the verdict of the jury and the jury be dismissed from further consideration of the case.   I furthermore ask to be granted an exception to the instructions to the jury to retire and reconsider the case."   The court disposed of this motion as follows: "This motion is overruled.   The court understood the foreman to say that the jury had not agreed upon the question of conspiracy, and being under the impression that they did not understand that it was necessary to consider that question we have directed them to re-

tire to their room for further consideration." The court thereupon granted an exception to the defendant. The events above recited, being incidents of the trial and having been brought upon the record by a bill of exceptions, are reviewable in this court: McConnell v. Linton, 4 Watts, 357. The jury, having spent some time in further deliberation, came into court the second time and announced that they had agreed upon a verdict. Counsel for the defendant thereupon objected to the reception of any verdict at that time, "in view of what the jury has heretofore said." The court overruled this objection and noted an exception for the defendant; thereupon the verdict upon which this judgment was entered was duly taken, the jury being polled at the request of counsel for the defendant, and the verdict, finding the defendant guilty as indicted, was duly recorded, and affirmed by the jury.

If there was error on the part of the learned judge of the court below, it was in refusing to receive the first verdict tendered, and in not permitting it to be entered upon the record and affirmed by the jury in the usual way. The functions of the court and the jury, in so far as the question presented by this record is concerned, are under our system of criminal procedure, well defined. Discussion may have arisen as to whether it is within the province of the jury to determine questions of law, in cases where a general verdict is required, but all authorities agree that the facts must be found by the jury. When a verdict cannot be construed to have found all the essential facts no valid judgment can be entered upon it and the state and the accused are put to the inconvenience and expense of a new trial and the resultant delay. This being the case, the administration of justice must become a mockery if the courts were required to receive and record every verdict tendered, however informal and unresponsive to the issue. It is essential to the promptness and certainty of the administration of justice that the courts shall have the power to direct the jury to correct mere formal defects in verdicts, and advise them of defects in substance and send

them back to further consider the case, with proper instructions as to the form of their verdict in case they acquit or convict the defendant. That the trial courts' have power, which it is their duty to exercise, to see that an insufficient verdict, not authorized by law, does not pass into the records of the court is a doctrine founded in sound reason, amply sustained by authority. It is, of course, true that when the verdict tendered is a full and explicit response to the issue submitted and acquits the defendant, the court has no discretion in the matter and must receive and record the verdict. "If the jury by mistake or partiality give their verdict in court, yet they may rectify their verdict before it is recorded, or by advice of the court go together again and consider better of it, and alter what they have delivered. But if the verdict be recorded, they cannot retract or alter it:" 2 Hale's Pleas of the Crown, 299. "If the jury through mistake deliver an improper verdict, the court may, before it is recorded, desire them to reconsider it. The jury may also rectify their verdict in the same stage of the proceedings, and it will stand as ultimately amended:" 1 Chitty's Criminal Law, 647; Walters v. Junkins, 16 S. & R. 414; Scott v. Scott, 110 Pa. 387; Kramer v. Kister, 187 Pa. 227; Wolfran v. Eyster, 7 Watts 38; Reitenbaugh v. Ludwick, 31 Pa. 131. "In every case of a verdict rendered the judge should look after its form and substance, so far as to prevent a doubtful or insufficient finding from passing into the records of the court, to create embarrassment afterwards, and perhaps the necessity for a new trial:" 1 Bishop's Criminal Procedure, sec. 831. When the verdict tendered is defective in form only, being sufficient in substance, it is proper for the court to direct the jury how it may be amended. When the finding is defective in substance, the correction must be made by the jury, and the court should be careful to avoid suggesting what the substance of the verdict shall be. When a jury tenders a verdict which is defective in substance, uncertain, repugnant, or not responsive to the issue, it is proper for the court to reject it, as not warranted

by law, call the attention of the jury to the defect, instruct them as to the form of verdict in case they mean to acquit or convict the defendant and send them back to their room where they can, untrammeled by the presence and influence of others, find such verdict as they think proper: Beates v. Retallick, 23 Pa. 288; Commonwealth v. Nicely, 130 Pa. 261; Commonwealth v. Thompson, 116 Mass. 346; Porterfield v. Commonwealth, 91 Va. 801; Pehlman v. State, 115 Ind. 331, (17 N. E. Repr. 270); Mangham v. State, 87 Ga. 549; Walker v. State, 13 Tex. Ct. App. 618; Grant v. State, 33 Fla. 291; State v. Arrington, 7 N. Car. 571; State v. Bishop, 73 N. Car. 44; State v. Whitaker, 89 N. Car. 472; State v. Godwin, 138 N. Car. 582; Blair v. Commonwealth, 93 Ky. 493; State v. Davis, 31 W. Va. 390; People v. Jenkins, 56 Cal. 4; State v. Clifton, 30 La. Ann. 951. If the first verdict tendered by the jury in this case was not responsive to the indictment, did not cover all the questions of fact involved in the issue; if, in short, it did not acquit the defendant, it was proper for the court to reject the verdict and send the jury back for further deliberation, for the jury had not been discharged and had not separated.

Did the first verdict tendered by the jury acquit the defendant? The verdict tendered, when the jury were asked by the clerk if they had agreed upon a verdict, was written upon the indictment and, as printed in the record and as read to the jury by the court in the colloquy which followed, was in these words: "Guilty of defrauding the Commonwealth." This was the only verdict tendered by the jury to the court at that time, or prior to the time when after further deliberation, they returned the verdict which was recorded and upon which judgment was entered. The indictment charged the defendant with having conspired with John H. Sanderson and others to defraud the commonwealth and averred, as the overt act done in pursuance of the conspiracy, the presentation, certification and payment of a certain false invoice, and concluded "Whereby, the said Commonwealth of Pennsylvania was cheated and

defrauded, as aforesaid, of the sum of more than twenty-five thousand, five hundred and seventy-seven dollars and thirty cents, then and there the property of the Commonwealth of Pennsylvania, contrary to the form of the act of Assembly &c." The verdict tendered attempted to find the defendant guilty of defrauding the commonwealth, without passing upon the question whether or not he was guilty of the criminal conspiracy charged in the indictment. The verdict in so far as it attempted to pass upon the facts involved in the issue found the defendant guilty. It did not acquit the defendant, it did not say he was not guilty of conspiracy, but so far as it did pass upon the facts, it was a finding against the defendant. The finding did not, however, pass upon the question whether the defendant was guilty or not guilty of the conspiracy charged in the indictment; it was not responsive to the issue which the jury had been sworn to try; and no valid judgment could have been entered upon it. The learned judge of the court below was entirely right in declining to receive and record this insufficient verdict, and his instructions to the jury, in defining the issue upon which they were to pass and advising them as to the form in which their verdict should be clothed in case they should acquit or convict the defendant, were free from error. The contention of the appellant that the court should have disregarded the written verdict which the jury had tendered as their finding and caused to be entered, as the verdict of the jury, one of the contradictory statements made by the foreman, as to the meaning of the written verdict, is not well founded. The colloquy between the court and the foreman of the jury, which followed the formal presentation of the verdict, had reference to the meaning of the written verdict and to that alone. The question of the court, each time, was what does this, the written verdict, mean? The foreman, in his replies, did not attempt to assert that the verdict tendered meant anything more or less than what its words implied. All his answers only tended to show the process through which the jury had arrived at an agree-

ment to render a verdict which was not responsive to the issue. The answer of the foreman to the first question of the court, as to whether the jury meant by the written verdict to find the defendant guilty of the conspiracy charged in the indictment, was, "No, sir;" his answer to the second was, "It is changed, don't you see?" This clearly revealed that the jury had attempted to change the issue and avoid passing on that question. The court then said, "You say that 'the defendant is guilty of defrauding the Commonwealth.' We ask you whether you mean by that, whether you find him guilty of the charge contained in this indictment. Is that what you mean?" The answer of the foreman to this third question was, "We let the conspiracy off, we agreed to let the conspiracy off." Here again was an explicit declaration that the jury had agreed to ignore the charge of conspiracy and render a verdict which did not pass upon the real question at issue. The court then said: "The question to determine is, whether he was guilty of conspiracy;" and, thereupon, the foreman said: "That is what we would not agree." This was an express declaration that the jury had not agreed as to whether the defendant was or was not guilty of the conspiracy charged in the indictment. The court then inquired, "Have you considered that?" The reply was, "Yes, sir; and we agreed that there was no conspiracy; we have agreed on that." This was an express declaration, by the foreman, that there had been an agreement, whether by all the jury he did not say, that there had been no conspiracy, but he did not say that the jury had agreed to render a verdict that there had been no conspiracy or that the defendant was not guilty of conspiracy. In answer to the sixth and last question of the court, as to the meaning of the written finding tendered, the foreman flatly said, "They all agreed; that is the only way they would agree." The preceding answer of the foreman, which indicated that there had been an agreement upon the question of the conspiracy, was inconsistent with all his answers which had preceded it, and it is also

inconsistent with this last answer; which certainly meant that they had all agreed to the finding embodied in their written verdict, and that, thus far, they had not agreed upon anything else.   The jury made no offer or attempt to amend or correct the written verdict which they had tendered and which was absolutely unresponsive to the issue. The answers of the foreman could not by any reasonable implication be held to constitute an oral verdict.   Even if the answers of the foreman, as to the meaning of the written verdict tendered, were proper to be considered in connection with and as a part of the verdict first tendered by the jury, then one of those answers could not be selected as the verdict, to the exclusion of all others; but all the answers would have to be considered.

The written finding, which was the only verdict actually tendered by the jury, was clearly insufficient and not responsive to the issue, and if it be taken in connection with the answers of the foreman as to its meaning, the whole, taken together, was still insufficient, uncertain and repugnant.   It could not be construed as a verdict which definitely passed upon the real issue presented.   This being the case it was clearly proper for the court to direct the jury to retire for further deliberation.   But, as we have already said, the conflicting answers of the foreman were no part of the verdict which the jury tendered.   The learned counsel representing the appellant argue that the questions repeatedly addressed by the court to the jury, as to the meaning of the first verdict tendered, constituted an improper interference by the court with the functions of the jury and involved coercion of the latter.   We have examined the record with care and, after maturely considering the argument presented, are convinced that the complaint is without merit.   If after the replies of the foreman to the second, third and fourth questions of the court, which clearly indicated that the jury had not agreed upon the question whether the defendant was guilty of conspiracy, the court in pursuing the colloquy had received an answer definitely stating that the jury had agreed that

the defendant was guilty of conspiracy, and if the court had then attempted to amend the verdict and cause it to be recorded as finding the defendant guilty, a very different question would have been presented. The court did not attempt to amend the defective verdict nor did it instruct the jury as to what should be the substance of their verdict. The learned judge did nothing to influence the jury as to the substance of their verdict. Having arrived at the correct conclusion that the verdict tendered was unresponsive to the issue, he clearly and impartially stated to the jury the real issue involved; said to them, "If you have not considered that or reached a determination upon that, you may retire and consider that question," and then instructed them as to the form in which they should clothe their verdict, whether they found the defendant guilty or not guilty, in words which contained no intimation as to what the substance of the verdict should be. The specifications of error are all dismissed.

The judgment is affirmed, and it is ordered that the defendant appear in the court below at such time as he may be there called and that he be by said court committed until he has complied with that part of the sentence which had not been performed at the time this appeal was made a supersedeas.