Commonwealth *v.* Komatowski, Appellant.

Argued May 24, 1943. Before MAXEY, C. J.; DREW, LINN, STERN, PATTERSON, PARKER and STEARNE, JJ.

*A. Evans Kephart* and *Ben Branch,* with them, *John W. Kephart,* for appellant.

446

*Frank X. York,* with him *Daniel Dougherty,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, June 30, 1943:

This appellant, aged about 55 years, was indicted for the murder of Pierce Rehrig, a friend and companion aged 66 years. They resided in Lehighton. Komatowski made his home with Evelyn Christman, who was Rehrick's partner in the textile business. In the colder parts of the year Rehrick, who apparently lived much apart from his wife and daughter, spent considerable time with Miss Christman and Komatowski at the Christman residence. The Rehrick family and Miss Christman each had a cottage in the country a few miles from Lehighton. Rehrick spent the summer months at the Rehrick cottage, while Miss Christman and Komatowski spent considerable time at the Christman cottage at the same place. There was a small pool 35 feet west of the Rehrick cottage and 70 feet north of the Christman cottage. It was 19 inches deep at the edge and 22 inches deep at the center. The Commonwealth charged that on Saturday, June 7, 1941, Komatowski took Rehrick from the porch of the latter's cottage to the pool and "heaved" him into it, thus causing him to drown. It was established that he was drowned and there were only negligible marks on his body. He suffered from paralysis agitans and had little muscular control. He was attended by a man named Auge. On the Saturday in question Auge attended him at the Rehrick cottage and then departed, leaving Rehrick on his porch with Komatowski and a man named Pennell.

Pennell was called as a witness in this case by the Commonwealth and he testified that when he saw'Rehrick at the latter's cottage a little before 6 P. M. on the night of his death, Rehrick was "very feeble" and "shuffled along" and the defendant helped him in his walking.

Later he saw Rehrick "standing on the porch". Pennell then left and went to the Christman cottage. While he was at the Christman cottage is the time the Commonwealth claims that the drowning of Rehrick took place. Pennell was asked: "Did you hear any noise [at that time]?" He answered, "No", and in reply to a question said there was "no reason why he didn't hear" [if there had been a noise]. Then the defendant came over to Pennell and said, "I have got to get out of here before the A. & P. store closes." That was about 7 P. M. He and defendant left together. Pennell asked defendant how the old man [Rehrick] was, and Komatowski said "O. K." They then went away and after stopping at a few places for alcoholic beverages they arrived at the A. & P. store about 8 P. M. At 9 P. M. defendant said he had to get back "to stay with the old man that night".

Lewis Hall and the defendant found the body of the deceased at 9:30 P. M. Sunday, June 28th. At that time Hall had a flashlight with him. He was accompanied by Komatowski and he suggested to the latter that they "report the thing". It was reported, and Corporal McIlvaine of the Pennsylvania Motor Police arrived about 10:45 P. M., when the body was taken from the water. Komatowski was not present at that time. He was taken into custody that evening and on the following Tuesday he signed a confession which he later repudiated and which he declared he was forced by the officers to make. In this confession defendant made this statement: "I walked up the front steps of Rehrig's bungalow, and I found Pierce Rehrig standing up against the railing, shaking and in a terrible nervous condition. I asked him what was wrong. He said he wished he was dead. He then asked me to take him down to the water, as he wanted to die, that he was tired of living. I stayed on the porch about five minutes trying to talk him out of the idea, but it was no use, as he kept on begging. Finally I took a hold on his right arm and led him down the front steps, and toward the pool. I lifted both of his

feet over the wooden cap piece on the side of the dam, and stood him on the edge of the dam face forward, and leaning forward. I released my grip on him and he fell into the dam. I turned around and walked across the auto drive to the place where Pennell and I had been sitting. When I got there Pennell was gone, so I walked over to my parked car, and Pennell was sitting. The back of my car was toward the dam, facing toward the highway."

On Tuesday, June 30th, Corporal McIlvaine took the defendant to the dam or pool, and defendant illustrated to him how he "lifted" the deceased into the pool. The Corporal said that Komatowski had "both hands around my torso from the rear, above the waist." Komatowski when asked the same evening to repeat the demonstration, did so, but the subsequent demonstration differed from the first one.

At the trial the Commonwealth called thirty-one witnesses and the defendant twenty-seven. The two chief factual issues were, first, Rehrick's ability to walk without assistance, its being the Commonwealth's contention that he could not have gotten from the porch to the pool unless someone carried him there or helped him there. On this question the testimony was completely conflicting. The other issue was whether or not defendant's confession, which he made on the Tuesday after Rehrick's death and which defendant later repudiated, was forced from him by methods which are customarily referred to as "the third degree" and which appellant's counsel characterize as "brutal and inhuman treatment". These two issues of fact, like all other factual issues, were of course for the jury. The record shows that the jury rendered the following verdict: "And Now, January 29th, 1942, the Jury in this case came into Court and say they find the defendant, Fred Komatowski, Guilty of Murder in the Third Degree—at 1:45 P. M." The jury was then polled, and their answer in each case was "Guilty of Murder in the Third Degree." The Clerk

then said to the jurors: ". . . You say you find the defendant guilty of Murder in the third degree. Is this your verdict?" The jury answered: "It is." The defendant was thus convicted of a crime utterly unknown to the law. Defendant filed a motion for arrest of judgment on the ground that the verdict rendered by the jury was without legal effect. This motion should have been granted. It was denied and the defendant was sentenced to pay a fine of $3,000 and to undergo imprisonment in the Eastern Penitentiary for from six to twelve years for "voluntary manslaughter", a crime of which he had *not* been convicted.

This case has most peculiar aspects, one (but not the *only* one) of them being that after the defendant was taken before a justice-of-the-peace following his confession no hearing was held but he was discharged. As to this discharge on June 10th, the appellant's paper book contains the following statement: "The District Attorney promised that if the defendant would say nothing anywhere else about his ill treatment [preceding the confession] the charge of homicide would be dropped. Komatowski accordingly made the promise and the charge was dropped. The District Attorney refused to prosecute, believing the confession was forced, but later proceedings were re-commenced by others against Komatowski." (He was re-arrested on June 24th.) In the Commonwealth's brief the following statement is made: "District Attorney Heimbach upon a report to him that Komatowski had verbally admitted he helped Rehrig to commit suicide, after Komatowski had re-enacted the crime to James Yenser, Chief of Police of Lehighton, and the prosecutor, Corporal McIlvaine, on two occasions, after he declared he heaved Rehrig into the pool, and after the defendant signed a written confession admitting the crime, instituted a proceeding before Squire Seip of Palmerton, Pa. This proceeding was dismissed at the suggestion of the District Attorney, in a hearing had secretly at midnight . . . The District Attorney

did not withdraw from the prosecution because he believed the confessions were forced, or that prosecution was caused by other persons. District Attorney Heimbach petitioned the Court to be superseded because he alleged that he was counsel for persons who might be involved in the prosecution, as private counsel before the crime. He further asked to be superseded because he believed he might be called as a witness for the Commonwealth in this connection."

District Attorney Heimbach may have had proper personal reasons for getting out of this case after the defendant was re-arrested for this alleged murder, but the dropping of his murder charge so suddenly after Komatowski's alleged confession and after his promise not to prosecute those officers who, he said, had beaten him, creates a suspicion that certain persons who helped secure that confession had something which they wished to "cover up" and that the best way to do this was to bribe Komatowski into silence by setting him free.

The district attorney's actions in this case certainly invite censure and challenge investigation. He testified that he asked the defendant to "promise me that upon his release that evening" in the office of 'Squire Seip that he, the defendant, "would not mention anything whatsoever relative to having been beaten up by any of the officers", and that "he so promised". He also said that Komatowski refused to sign the alleged confession unless the allegation that "it was true" was stricken out. On cross-examination the district attorney made this statement: "After Fred Komatowski had stated that the confession was gotten out of him as a result of being beaten up, beaten up by Harry Yenser,[1] [Chief of Police of Lehighton], after it was decided to dismiss Mr. Komatowski for the time being, I turned to Mr. Komatowski in the presense of McIlvaine, Hines, and

---

[1] There was no allegation of the defendant's having been beaten by State Motor Police officers.

I believe 'Squire Seip, and told Komatowski that he was going to be discharged, but prior to being discharged he would have to submit himself to a medical examination that evening, that the medical examination could be dispensed with if he promised me that in the future he would not mention being beaten up, neither would he bring any suit against any of the officers charged with having beaten him up. He did not refuse to submit to an examination by a physician, but he did state that instead of being examined by a physician that he ac· cepted the second of the alternatives, that is, that he would not mention the fact that he was beaten up. Therefore, he was discharged that evening." [2]

It was the district attorney's duty to ascertain whether or not this defendant had been beaten and if he had been so beaten it was his duty to prosecute those responsible for it. To beat up a defendant while he is in custody is a crime not only against the immediate victim but also against the public, for it brings the administration of justice into disrepute. If the district attorney induced this defendant not to prosecute those who had assaulted him, by promising to release him from custody, his action comes very close to compounding a crime.

The most peculiar thing about this case is the verdict, and its irregularity is so at variance with the very fundamentals of "due process of law", that it requires the discharge of the defendant and makes unnecessary the discussion of any other point raised.

[2] Since this opinion was filed the District Attorney has submitted a statement saying that in testifying as he did he made "an unfortunate choice of words", and that the thought he intended to convey was that "since there were no marks or any indication of Komatowski's having been beaten", he, the District Attorney, meant by his statement to the defendant, that the latter should *either* submit to a physical examination to disclose whether or not he had been beaten *or* agree that he would thereafter make no charge of having been beaten while in custody.

The Commonwealth cites in support of the acceptance of this peculiar verdict and the legality of this sentence, the case of *Com. v. Gable*, 7 S. & R. 423. In that case the defendant was tried for murder. The verdict was "not guilty of murder but guilty of manslaughter". A motion was made in arrest of judgment. The court ruled that the intention of the jury was sufficiently manifest from its verdict and that it supported a conviction of voluntary manslaughter. This court, in an opinion by Chief Justice TILGHMAN, said: "One who is indicted of murder, cannot be convicted of involuntary manslaughter, because it is well settled, that there cannot be a conviction of a misdemeanor, on an indictment for felony. Therefore, when on an indictment for murder, the jury find that the defendant is guilty of manslaughter, it must be understood, such manslaughter as is felonious, which can be no other than voluntary manslaughter."

In that case this court went as far as it has ever gone in permitting a trial judge to construe a verdict which is returned by the jury in a form not completely proper and to impose a sentence on the verdict so construed. To permit the utterly meaningless verdict returned in this case and the sentence imposed thereon, to stand would be a reflection upon our American system of administering justice and would be contrary to the basic requirements [3] of our law that a crime must be ac-

---

[3] As to the necessity of precision in the prescriptions of the law, see Blackstone, Book 1, sec. 46, and Book 4, sec. 2.

In the argument of Jeremiah S. Black in the case in which he secured an order from the Supreme Court of the United States for the release in habeas corpus proceedings of Milligan, Bowles and Horsey (*Ex parte Milligan*, 4 Wall. 2), who were under sentence of death imposed upon them by a military commission convened at Indianapolis in 1864, Attorney Black said: "My clients were dragged before this strange tribunal, and after a proceeding which it would be mockery to call a trial, they were ordered to be hung. The charge against them was put into writing and is found on this record, but you will not be able to decipher its meaning . . . The judge advocate

curately defined, the indictment must be drawn with meticulous accuracy so that a defendant may know the charge he has to meet and that a verdict on such indictment must be either not guilty, or guilty of one of the major crimes therein or of a lesser crime necessarily involved in the major crime so charged. See *Com. ex rel. Moszczynski v. Ashe,* 343 Pa. 102, 21 A. (2) 920. As to a conviction for a constituent misdemeanor involved in a felony *not* being permitted, see *Com. v. Adams,* 2 Pa. Superior Ct. 46.

Since the defendant has the constitutional right "to demand the nature and cause of the accusation against him" (Pennsylvania Constitution, Art. 1, Sec. 9), it follows that he cannot be convicted of an offence which is not the accusation made against him or any constituent thereof.

Since the State has never declared *any* conduct to be "murder of the *third* degree" no person is compelled to answer to that charge, and no person can be convicted in the courts of Pennsylvania on any such charge. Since malice is an ingredient of murder but not of manslaughter, "murder of the *third* degree" cannot by any process of reasoning be construed as voluntary manslaughter. Blackstone says that manslaughter when voluntary arises from the sudden heat of the passions, murder from the wickedness of the heart." (4 Blackstone 190). A sentence to the penitentiary on a verdict like the one now before us cannot be permitted to stand merely on the trial judge's *conjecture* that the jury

---

must have meant to charge them with some offense unknown to the laws, which he chose to make capital by legislation of his own, and the commissioners were so profoundly ignorant as to think that the legal innocence of the parties made no difference in the case . . . The commissioners are not on trial; they are absent and undefended; and they are entitled to the benefit of that charity which presumes them to be wholly unacquainted with the first principles of natural justice, and quite unable to comprehend either the law or the facts of a criminal cause."

*meant* to convict the defendant of voluntary manslaughter.

The "special attorneys" for the Commonwealth say in their paper book: "During the course of the trial reference was made by several witnesses to the four degrees of Homicide. These were referred to as having been explained to the defendant, at his request, and the penalties thereon. Commonwealth understood that Murder in the third degree in this testimony was Voluntary Manslaughter. Defendant and his Counsel, likewise, so understood, as Counsel brought out reference to it as such in his cross-examination of James Yenser. The Court [4] also so understood the term as it was openly referred to in pleas to the jury, and in the testimony of witnesses. We may, therefore, from its common use in the case, deduce its meaning and the jury in its finding adopted this language and convicted in that degree . . . Voluntary Manslaughter was freely referred to during the trial, as Homicide of the third degree . . . The jury had reasonable cause to believe they could find a verdict of guilty of Murder in the Third Degree."

All this proves is that this case was tried in such a loose and irregular manner as naturally to beget this monstrosity of a verdict which has no "ancestry" known to the law and which we trust will never have any courtroom "posterity". Every member of this Court is surprised that the trial judge and the Commonwealth's "special counsel" would apathetically stand by and after

---

[4] The trial judge in his charge referred to the defendant as asking the Chief of Police before the alleged confession was made "to explain the four degrees of homicide". Whether these words were quoted from Komatowski or are the trial judge's is not indicated. In narrating to the jury another witness's testimony the trial judge said, "Corporal McIlvaine explained the four degrees of homicide". Whether in saying this the trial judge was using Corporal McIlvaine's words or his own does not appear. Such expressions from the trial judge naturally misled the jury to return this improper verdict, which is apparently without a parallel in the annals of the criminal courts of this Commonwealth.

hearing this ridiculous and meaningless verdict repeated thirteen times would permit it to be recorded. The jury should have been sent back to the jury room with proper instructions as to the four verdicts possible under this indictment, to wit: Guilty of murder in the first degree, guilty of murder in the second degree, guilty of voluntary manslaughter, and not guilty. In *Com. v. Huston,* 46 Pa. Superior Ct. 172, at p. 220, the Superior Court quoted with approval the following from 1 Bishop's Criminal Procedure, sec. 831: "In every case of a verdict rendered the judge should look after its form and substance, so far as to prevent a doubtful or insufficient finding from passing into the records of the court, to create embarrassment afterwards, and perhaps the necessity for a new trial." The court also said, at pages 219 and 220: ". . . The administration of justice must become a mockery if the courts were required to receive and record every verdict tendered, however informal and unresponsive to the issue . . . When the verdict tendered is defective in form only, being sufficient in substance, it is proper for the court to direct the jury how it may be amended. When the finding is defective in substance, the correction must be made by the jury, and the court should be careful to avoid suggesting what the substance of the verdict shall be. When a jury tenders a verdict which is defective in substance, uncertain, repugnant, or not responsive to the issue, it is proper for the court to reject it, as not warranted by law, call the attention of the jury to the defect, instruct them as to the form of verdict in case they mean to acquit or convict the defendant and send them back to their room where they can, untrammeled by the presence and influence of others, find such verdict as they think proper", (citing numerous cases).

No authority is needed to sustain the proposition that a defendant cannot be legally convicted of a crime neither charged in the indictment nor a necessary constituent of any crime so charged, but on those rare

occasions when such a question has come before the appellate courts of this State they have consistently held as we hold in this case that such a conviction is a nullity. In *Walters et al. v. Com.,* 44 Pa. 135, the defendants were charged with murder and voluntary manslaughter. The jury found them guilty of only *in*voluntary manslaughter. Upon appeal this court said: "The prisoners have been acquitted by the verdict of all crimes charged in the indictment, and convicted of a charge not made in or embraced by it. We will therefore simply reverse, for no new trial could be ordered in such a case."

In *Com v. Adams,* supra, the Superior Court ruled that for reasons that are therein cogently set forth "upon an indictment for murder, there can be no conviction' of aggravated assault and battery, or simple assault and battery", and there held that a defendant who had been tried for murder and convicted of assault and battery was entitled to have the judgment on the verdict reversed and to be discharged from imprisonment.

In *25 Standard Encyclopedia of Procedure,* pp. 990, 991, 992, there is set forth the following: "Verdicts in criminal prosecutions must be responsive to the charge in the indictment or information, and must answer the issues raised by the indictment or information and plea, and determine the guilt or innocence of the accused of the crime charged against him. A verdict is irresponsive . . . if it finds the defendant guilty of an offense not charged against him, or included in that charged. If there is any uncertainty as to whether the defendant is found guilty of the offense with which he is charged, or of another, the verdict is objectionable . . . A good verdict of conviction must contain either within itself or by reference to the indictment or information all the elements of the crime." (Citing cases from many jurisdictions.)

The judgment of the court below is reversed, the sentence is set aside, and the defendant shall be forthwith discharged from imprisonment unless there is cause for his detention other than the sentence now vacated.